Eichabdson, Ch. J.,
delivered the opinion of the court:
It is a well-known historical fact that soon after the commencement of the war of the rebellion the Government took control of all the railroads in the seceding States. There was appointed a “ director and general manager of military railroads,” and the business formed one of the divisions of the Quartermaster-General’s Office in the War Department.
The claimant’s road, being so situated, was taken actual possession of, repaired, and run by the defendants. In making the repairs there was removed from the road a quantity of scrap iron, and “ T ” rails taken from the Manassas Gap Eail-road Company were put down in the place of the iron removed, and remained there until the road was surrendered to the claimants in January, 1866. The scrap iron so removed was stored in a warehouse of defendants in Alexandria, Va.
In May and July, 1865, the Quartermaster-General wrote *515 letters to the Secretary of War (set out in finding iv) advising the following, among other things:
“ 1st. The United States will, as soon as it can dispense with the military occupation and control of any road of which the Quartermaster’s Department is now in charge,,turn it over to the parties asking to receive it who may appear to have the best claim and be able to operate it in such manner as to secure the speedy movement of all military stores and troops; the Quartermaster-General, upon the advice of the military commander of the department, to determine when this can be done, subject to the approval of the Secretary of War.
“ 3d. All materials for permanent way used in the repair and construction of the road, and all damaged material of this class which may be left along its route, having been thrown there during the operation of destruction or repair, to be considered as part of the road and given up with it.
“6th. All rolling stock and material, the property before the war of railroads, and captured by the forces of the United States, to be placed at the disposal of the roads which originally owned it, and to be given up' to these roads as soon as it can be spared and they appear by proper agents authorized to receive it.” .
These letters were indorsed July 23, 1865, by the Secretary of War as follows: “ The recommendation of1 the Quartermaster-General is approved, and he is directed to turn over the roads immediately.”
November 16,1865, the claimant’s president made application to the Secretary of War for a return of its road, which application was referred to the Quartermaster-General, who, on the same date, recommended compliance with the request. December 14,1865, the Secretary of War made this indorsement on the application: “Eeturned to the Quartermaster-General with directions to turnover the road to the company.” (Finding vi.)
There was some delay in carrying out this order, apparently while the claimant’s company was making arrangements for operating the road in compliance with the requirements of the War Department by the first of a series of “principles” or conditions recommended by the Quartermaster-General in his letter of May 13,1865, and approved by the Secretary of War.
The condition to be complied with by the claimant’s company before it became entitled to a return of its road and the iron is set out in the letter of the Secretary of War of August 8,1865, *516 to General Thomas, commanding the military division of Tennessee, in connection with other roads similarly situated, as follows:
ul. Each and every company will be required to reorganize and elect a board of directors whose loyalty shall be established to your satisfaction.” (Finding y.)
The condition was treated by the Secretary of War, December 14, 1865, by said indorsement directing the road to be turned over to the claimant without mentioning the condition, as practically complied with. As there had been some oral communications between him and the president of the company it maybe presumed that the negotiations for leasing and operating the road by the Baltimore and Ohio Eailroad Company were known to him and the loyalty of its directors assumed, and that on this account the condition was in effect held to be satisfied. Whatever were the reasons, the same poAver which made the condition could determine Avhat was a compliance with its provisions, or could waive its performance in any case in accordance with its discretion.
By this order of the Secretary of War the claimant became entitled to the return of its road and to all the benefits of the executive order set out in the findings. The defendants thereafter, either because it Avas inconvenient to continue the storage of the iron any longer, or because it Avas so mingled with a large quantity of other iron that there was difficulty in restoring it in kind, proceeded to sell the iron for $30,340.00 and to use the proceeds, received early in January, 1866, for the benefit of the defendant through the War Department.
This brief statement, more folly set outindetail in the findings, shows the claimants to have a meritorious cause of action, and that they are entitled to recover unless their claim is barred by the statute of limitations because the petition was not filed within six years after the cause of action first accrued, according to the provisions of Eevised Statutes, section 1069, as interpreted by the Supreme Court with reference to claims transmitted to the court by the heads of Departments under Eevised Statutes, section 1063, as Avas done with this claim by the Secretary of War, March 12,1889.
In Finn’s Case (123 U. S. R., 227) the Supreme Court decided that “ when the claim is of such a character that it may *517 be allowed and settled by an Executive Department, or may, in tbe discretion of tbe bead of sncb Department, be referred to tbe Court of Claims for final determination, tbe filing of tbe petition sbonld relate back to tbe date when it was first presented at tbe Department for allowancs and settlement,” substantially as bad been previously decided in Lippitt's Case (100 U. S. R., 663).
As early as November, 1865, tbe claimant made application for a return of tbe iron. Without questioning tbe claimant’s right to tbe same, but apparently while negotiations were pending with tbe -Baltimore and Ohio Eaüroad Company for operating the road, tbe matter was then postponed. Tbe claimant acquired a right to tbe iron when tbe Secretary of War directed tbe road to be turned over to it December 14, 1865, which carried with it, according to tbe executive orders, tbe same right as other roads similarly situated, to “all tbe rolling stock and material tbe property before tbe war, of railroads.”
Tbe Baltimore and Ohio Eailroad Company, by its president, wrote to tbe Quartermaster-General on tbe subject, and received a reply of facts, disclosed, it must be assumed, by tbe records of bis office. Some years after that tbe same company formally presented a claim to the War Department for tbe money for which tbe rails bad been sold.
This was referred to tbe Quartermaster-General, who made a report December 7, 1885, treating tbe claim as tbe same presented for tbe iron in 1865, and as still pending in tbe Department. He reported that “tbe claimant is entitled to tbe relief which tbe circumstances of the case seem to justify. But it is not believed to be in the power of tbe Executive Department to afford relief at this time without tbe intervention of Congress.”
Upon that report the Secretary of War made tbe following indorsement:
“ Tbe within report of tbe Quartermaster-General is approved, and tbe accompanying papers in tbe claim of tbe Baltimore and Ohio Eailroad Company for tbe proceeds of railroad iron, stated by tbe company at $30,340, are hereby respectfully referred (through office of tbe Quartermaster-General) to tbe Third Auditor of tbe Treasury for settlement horn tbe appropriation 1 Transportation of tbe Army and its supplies; ’ the amount found due to be reported to Congress for appropriation.”
*518 It bas repeatedly been held that the absence of available money or an appropriation out of which payment could be made by executive officers, is no defense in this court to a valid claim against the Government. (Collins’ Case, 15 Ct. Cls. R., 35; Shipman’s Case, 18 Ct. Cls. R., 147, and other cases.)
We think these proceedings show a sufficient presentation of the claim to the War Department within six years after it occurred, within the principles laid down in the Lippitt and Finn cases. From 1865 down to the time of its allowance by the Secretary of War, in 1885, the same claim was pending in the Department, where all the facts were matter of record. Unlike claims originating outside of the Department and requiring other than record proof of their validity, it did not require that particular demand, either oral or in writing, exacted for the latter claims, so long as the attention of the Department officers wras called to it in any informal manner, and it was held under consideration by them.
The Quartermaster-General and the Secretary of War treated the claim as one pending there since the demand of the claimant’s president in 1805. (Finding vm.)
The claim was referred by the Secretary of War to the Third Auditor as one in favor of the Baltimore and Ohio Eailroad Company, who were lessee of the claimant and to whom, as being able to operate it, the road was in fact surrendered in I860. Before the auditor an amendment was allowed by consent of all parties substituting the claimant corporation instead of the Baltimore and Ohio Eailroad Company, as appears by finding x. This was right and proper, both because Department proceedings are not subject to rules of pleading and technicalities and because there was a privity between the two companies, and the claim was presented to the War Department by the Baltimore and Ohio Eailroad Company, as lessee of the Winchester and Potomac Eailroad Company, setting out the fact that the iron was taken from the latter company.
In our opinion the claimants are entitled to judgment for $30,340, and it will be so entered of record.